W. G. ANDERSON, Thomas C. Chatmon, Jr., E. D. Hamilton, Slater H. King and Mrs. Dorothy M. Scriven, on Behalf of Themselves and all other Negroes of Dougherty County, Georgia, Similarly Situated, Plaintiffs,

v.

Miss Evelyn COURSON, Ordinary of Dougherty County, Richard Hobbs, Chairman of Democratic Executive Committee of Dougherty County, Georgia, and Members; Mercer Sherman, Ernest Wetherbee, Jr., Charles Jones, Jr., William T. Devine, Jr., Wilson Smith, Jim Champion, Jr., Louis Peacock and Stewart Watson; T. A. Kemp, Chief Registrar, Dougherty County, Asa D. Kelley, Jr., Mayor of City of Albany and City Commissioners; C. B. Pritchett, Jr., Jim Denson, Allen Davis, R. H. Warren and Buford Collins; and the City of Albany, Defendants.

Civ. No. 686.

United States District Court
M. D. Georgia,
Albany Division.

Jan. 8, 1962.

———◆———

C. B. King, D. L. Hollowell, Atlanta, Ga., for plaintiffs.

H. G. Rawls, Perry, Walters & Langstaff, Farkas, Landau & Davis, Albany, Ga., for defendants.

BOOTLE, Chief Judge.

The plaintiffs are five Negro citizens of the City of Albany, County of Dougherty, State of Georgia, and are qualified voters of said city and said county. They bring this action on their own behalf and on behalf of all other Negroes similarly situated with respect to the matters here involved. The suit is against the Ordinary of said county, the Chairman and Members of the Democratic Executive Committee of said county, the Chief Registrar of Voters of said county, the Mayor and City Commissioners of said city, and the City of Albany. Plaintiffs complain that over a period of many years the defendants and their antecedents in office have maintained and enforced racially segregated voting places in said city and county; that plaintiffs and all other Negroes similarly situated have during the last or more recent elections held by the defendants been required to vote in the municipal auditorium of said city without regard to geographical location of their respective residences, whereas white voters were assigned to precincts and voting places at which only white persons could vote notwithstanding the fact that said white persons resided in close proximity to said city auditorium; that the lists of qualified voters of said city and county on which the plaintiffs were listees during all relevant times, compiled by the Chief Registrar and by the City Commissioners, were at all previous elections held by them or in which they participated, and are by them now, grouped in lists according to race. Plaintiffs complain further that the defendants have established and are maintaining a policy, custom and usage of denying to qualified Negro voters the equal protection of the law by invoking a pattern of segregation in voting places in said county, solely because of color, that is to say, that white and Negro qualified voters are assigned or otherwise required by the defendants to vote at polling places reserved for members of their respective races exclusively without regard or consideration for any other standard or criterion. Plaintiffs allege their desire to vote in future elections on a non-racially-segregated basis and that they are suffering irreparable injury and are threatened with irreparable injury in the future by reason of the acts complained of. They allege the absence of any plain, adequate or complete remedy other than this suit for a declaration of their rights in the premises and for an injunction. Complainants desire a declaration that they and other Negroes similarly situated are being denied the equal protection of the law under the Fourteenth Amendment and under the laws of the United States by the regulations, exercise of administrative discretions and practices generally of the defendants in denying, burdening and otherwise restraining the plaintiffs and other Negroes similarly situated on account of their race and color from the exercise of their right to vote by (a) requiring them to vote at polling places which are racially exclusive and designated for Negroes irrespective of the geographical locations in said city and county at which they may reside, and (b) the creation of separate voting lists based upon race, for whites and for Negroes. Plaintiffs allege further that they have without avail appealed to all

of the defendants for rectification of their alleged grievances.

T. A. Kemp, Chief Registrar, answered that subsequent to the filing of this suit his term of office had expired; that he had not been re-appointed, but that others had been appointed and had qualified. Thereafter, plaintiffs filed a motion to drop Kemp as a party defendant and to substitute in his stead J. L. Bacon, Sr., the newly and duly appointed Chief Registrar. Accordingly, an order was signed naming J. L. Bacon, Sr., Chief Registrar as an additional party defendant. Thereafter, counsel for J. L. Bacon, Sr. presented a motion to dismiss J. L. Bacon, Sr. as a party, but subsequently advised the court by letter that, having talked to Mr. Bacon and having ascertained that Mr. Bacon planned to continue the policies of his predecessor, except insofar as they may have to be modified in the light of any ruling the court may make in this case, agreed that the case may proceed with Mr. Bacon as a party defendant.

Chief Registrar Kemp further admitted the allegations of the complaint alleging the creation of separate voting lists, based upon race, for white and for Negroes and admitted that white and Negro voters are assigned to separate voting places, but denied having any responsibility therefor. The Ordinary's answer also admits that white and Negro qualified voters are assigned to separate voting places, but denies any responsibility therefor. In the answer filed by the Mayor, the City Commissioners and the City of Albany, while denying that they have enforced racially segregated voting places within the City of Albany, they "admit that they have maintained separate voting places for the members of the white and Negro races."

In the answer filed by the Chairman and the members of the Democratic Executive Committee of Dougherty County they admit that they are the duly authorized and legally constituted members of the Democratic Executive Committee of Dougherty County and allege "that under the provisions of Chapter 34 of the Code of Georgia of 1933, sections 3209 and 3210 [1] they have the right to formulate rules and regulations for holding primary elections inclusive of time and place at which said elections shall be held, and they have heretofore exercised these powers "and they admit that in the past said Committee has provided separate voting places for white and Negro voters and deny that this denies to qualified Negro voters the equal protection of the law." Paragraph XIII of the complaint specifically alleges that the defendants have established and are maintaining a policy, custom and usage of denying to qualified Negro voters the equal protection of the law by invoking a pattern of segregation in voting places in Dougherty County, Georgia, solely because of race and color. In the answers filed by the defendants, all defendants, while making the admissions above set forth, deny the allegations of paragraph XIII, except that the answer of the Chairman and Members of the Democratic Executive Committee says:

"In answer to Paragraph 13, while the defendants admit, as heretofore stated, that in the past the Democratic Executive Committee of Dougherty County has provided separate voting places for white and negro voters, nevertheless, the defendants deny that this denies to qualified negro voters the equal protection of the law."

1. "34–3209 (135) Party authorities may formulate additional rules.—The party authorities shall, in all matters not provided for in this Chapter, formulate rules and regulations for holding said primary election and for making returns thereof to the proper party authorities. (Acts 1908, pp. 55, 57.)"

"34–3210. (136)—Time and place of election; returns; declaration of result. —Every such primary election shall be held at the time and place, and under the regulations prescribed by the rules of the party, organization, or association holding the same, and the return shall be made and the result declared as pre-

The parties, through their counsel, have entered into a stipulation of facts.[2]

The court finds the facts to be as stipulated, and upon the basis of said stipulation and of the admissions contained in the pleadings finds further that: the defendants have established and are: maintaining a policy, custom and usage

scribed in this Chapter. (Acts 1890–1, p. 210; 1900, p. 40; 1908, p. 55.)"

2. "1.

"It is stipulated that the United States District Court for the Middle District of Georgia, Albany Division, has jurisdiction of this action.

"2.

"It is stipulated that Miss Evelyn Courson is now and has at all times since February, 1952, been Ordinary of Dougherty County, Georgia; that the City of Albany is a geographical and political subdivision of the State of Georgia; that Richard Hobbs is chairman of the Democratic Executive Committee of Dougherty County, Georgia, and that Mercer Sherman, Ernest Wetherbee, Jr., Charles Jones, Jr., William T. Devine, Jr., Wilson Smith, Jim Champion, Jr., Louis Peacock and Stuart Watson are members of the Democratic Executive Committee of Dougherty County, Georgia; that T. A. Kemp was Chief Registrar of Dougherty County at the time of the institution of this action, but that said T. A. Kemp's term of office expired on July 1, 1961, and said T. A. Kemp was not reappointed to said office and is not at the present time serving; that Asa D. Kelley, Jr. is Mayor of the City of Albany, and that C. B. Pritchett, Jr., Jim Denson, Allen Davis, R. H. Warren and Buford Collins are the Commissioners of the City of Albany, Georgia.

"3.

"It is stipulated that all of the parties to this action are citizens of the United States, the State of Georgia, The County of Dougherty and the City of Albany and are residents and domiciled in said State, County and City, and that all of the parties plaintiff are Negroes. It is further stipulated that the plaintiffs in said action are qualified voters of Dougherty County, Georgia, and the City of Albany.

"4.

"It is stipulated that for many years separate voting facilities for the Colored and White Race have been maintained in the General and Special elections in Dougherty County and the City of Albany. Colored voters have been required in all these elections to cast their votes in the City Auditorium in the City of Albany, which is located in down town Albany at the North West Corner of the intersection of North Jackson Street and Pine Avenue. White voters in the City, County and State general and special elections are required to cast their votes at the Dougherty County Court House which lies one-half block from the City Auditorium. No voting facilities have been provided for Negro voters East of the Flint River. Voting facilities for both White and Colored, except voting places for White persons in East Albany, are and have always been in proximity to each other. No qualified voter is deprived of the right to cast their votes by virtue of such voting places as have been provided for White and Colored voters.

"5.

"It is stipulated that the Registrar, has, in the past, always furnished voting lists separated according to White and Colored voters.

"6.

"It is stipulated that the communications alleged to have been submitted by the plaintiffs to the various defendants and attached to the complaint as Exhibits 'P', 'Q', 'R', 'S', 'T', 'U', 'W', 'X', 'Y', 'Z', '1' and '3' were submitted and received as alleged. It is further stipulated that the communications from the Ordinary of Dougherty County attached to the complaint as Exhibits '2' and '4' were correct and were sent as alleged. It is further stipulated that at a meeting held between the plaintiffs and the Ordinary and the Chief Registrar and the County Attorney for Dougherty County, these two defendants submitted to the plaintiffs certain questions in writing, copies of which questions are attached to the answer of Evelyn Courson, Ordinary of Dougherty County, Georgia.

"It is further stipulated that the rest of the defendants made no official reply to the communications of the plaintiffs and no action of any kind has been taken by any of the defendants respecting the establishment of voting places for future elections.

"7.

"It is stipulated further that a Democratic Primary Election will be held in the City of Albany in the fall of 1961, followed by a general election, for the purpose of electing a Mayor and three (3) City Commissioners. No election is scheduled to be held, either primary or otherwise, for the election of County.

of denying Negro voters the equal protection of the law by invoking a pattern of segregation in voting places in Dougherty County, Georgia solely because of race and color, and the court now enters this memorandum intended to suffice as compliance with Fed.R.Civ.P. rule 52 (a), 28 U.S.C.A. with respect to findings of fact and conclusions of law.

■ This court has jurisdiction of this action. 28 U.S.C.A. § 1331; 42 U.S.C.A. § 1981; 28 U.S.C.A. § 1343(3) (4), and 42 U.S.C.A. § 1971, and the stipulation so declares. Also, there existing an actual controversy between the parties, this is a proper case for a declaratory judgment declaring the rights of the plaintiffs in the premises. 28 U.S.C.A. §§ 2201, 2202. Also, this is a proper case for a class action. Sharp v. Lucky, 252 F.2d 910, 913 (5th Cir.1958); Holmes v. Danner, 191 F.Supp. 394, 409 (M.D.Ga.1961), and cases there cited. The class here is composed of all Negroes who are qualified voters of Dougherty County, Georgia and/or the City of Albany, Georgia.

■■ Many cases decided by the Supreme Court and by the court of appeals for the fifth circuit, all binding upon this court, dictate that the plaintiffs are entitled to a declaratory judgment declaring (1) that the policy, custom, usage, and practice of the defendants in denying these plaintiffs and other Negroes similarly situated the right to vote at designated polling places which designation is based solely on race is a denial of the equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and

is also a violation of the Fifteenth Amendment to said Constitution as implemented by 42 U.S.C.A. § 1971(a); (2) that the policy, custom, usage and practice of the defendants in arranging the names of these plaintiffs and other Negroes similarly situated on lists comprising the names of qualified voters of said city and county by racial designation on separate lists is also a denial of the equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and a violation of the Fifteenth Amendment of said Constitution as implemented by 42 U.S.C.A. § 1971(a).

Under the Fourteenth Amendment,

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

■■ Insofar as the Fourteenth Amendment is concerned it is, of course, only state action that is prohibited. The line of forbidden conduct pointed out by the equal protection clause of the Fourteenth Amendment is indicated in the Civil Rights Cases, 109 U.S. 3, 17, 3 S.Ct. 18, 27 L.Ed. 835, where Mr. Justice Bradley, speaking for the court, said:

"In this connection it is proper to state that civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of

---

State or Federal Officials until the year 1962.

"8.

"That the Militia Districts over which George L. Sabados and J. W. Mock preside as Justices of the Peace do convene their Courts in the Dougherty County Court House.

"9.

"It is stipulated that there are five (5) City Wards into which the incorporated limits of Albany, Georgia is partitioned; that the Municipal Auditorium is situated in the second ward; that Negro

and White qualified voters reside in the second ward, and in at least some of the other said wards."

"10.

"It is stipulated that the Democratic Executive Committee of Dougherty County has held primary elections in the past, including the last primary election in 1960, and at all such elections has provided separate voting places for Negroes and Whites.

"Whereby the undersigned do hereby agree to the foregoing stipulations this 22 day of August, 1961."

individuals, unsupported by State authority in the shape of laws, *customs*, or judicial or *executive* proceedings." (Italics supplied).

Thus state policy violative of the Fourteenth Amendment may be expressed not only in legislative enactments, executive action, administrative action, or judicial action, but also in *customs*. Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207, concurring opinion of Mr. Justice Douglas; and "customs, practice, and usage" may constitute state action in violation of the Fourteenth Amendment even in the absence of any statute, ordinance, or promulgated order. Garner v. Louisiana, supra; Baldwin v. Morgan, 287 F.2d 750, 756 (5th Cir. 1961). It is not controlling, therefore, that no statute of the State of Georgia is pointed to affirmatively requiring segregation of the races in the process of voting. It is clear that all of the defendants acted in the matters complained of as public officials of the City of Albany, County of Dougherty, or State of Georgia, except the Chairman and Members of the Democratic Executive Committee and their action, too, in the premises, constitutes State action. Chapman v. King, 154 F.2d 460 (5th Cir.1946). The complained of actions of the defendants are because of their positions as public officials and party officials and by virtue of an assertion implied at least of a claim of authority to take such action. Hence such actions are under *color* of law.

"For 'It is clear that under "color" of law means under "pretense" of law. * * * [A]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea.' Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495, 1508." Baldwin v. Morgan, 251 F.2d 780,

786, 787 (5th Cir.1958); Baldwin v. Morgan, 287 F.2d 750 (5th Cir.1961).

And the Fifteenth Amendment says:

"The right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State, on account of race, color, or previous condition of servitude."

The concluding section of each of these two Amendments gives to Congress power to enforce such Amendment by appropriate legislation. The Fourteenth Amendment was adopted in 1868, and the Fifteenth on March 30, 1870. As appropriate enforcement legislation, the Congress, on May 31, 1870, enacted the Civil Rights Act, section 1 of which now constitutes 42 U.S.C.A. § 1971(a), and reads as follows:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

As was stated by the Supreme Court in Lane v. Wilson, 307 U.S. 268, 274, 59 S. Ct. 872, 83 L.Ed. 1281, 1287 (1939):

"The Fifteenth Amendment secures freedom from discrimination on account of race in *matters affecting* the franchise." (Italics supplied).

and as was stated by the Court on the next page:

"The Amendment [Fifteenth] nullifies sophisticated as well as simpleminded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to

vote may remain unrestricted as to race."

In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) segregation of white and Negro children in the public schools of the state was held to be a violation of the equal protection clause of the *Fourteenth* Amendment; and in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), segregation in the public schools of the District of Columbia was held to be violative of the due process clause of the *Fifth* Amendment. Those two cases hold that the "separate but equal" doctrine of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) has no place in modern public education. In Bolling v. Sharpe, supra, 347 U.S. at p. 499, 74 S.Ct. 693, the court said:

"Classification based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence *constitutionally suspect*. As long ago as 1896, this Court declared the principle 'that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the General Government, or by the States, against any citizen because of his race.' (citing Gibson v. Mississippi, 162 U.S. 565, 591 [16 S.Ct. 904, 40 L.Ed. 1075]). And in Buchanan v. Warley, 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149], the Court held that a statute which limited the right of a property owner to convey his property to a person of another race was, as an unreasonable discrimination, a denial of due process of law. (Italics supplied).

"Although the Court has not assumed to define 'liberty' with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective. Segregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children of the District of Columbia a burden that constitutes an arbitrary deprivation of their liberty in violation of the Due Process Clause."

The court of appeals for this circuit has decided that under Section 1 of the Fourteenth Amendment it is impermissible for a registrar in her official capacity to refuse to deal with a Negro attorney and his Negro client on business for which her office existed and for which it was maintained by the State of Louisiana and a Parish thereof "in her office" solely because they were Negroes, and to send them to another room in the courthouse. In the opinion the court said:

"It is not necessary to make an extended statement in light of all of the related cases decided by this Court and the Supreme Court, to support our conclusion that such official conduct is not permissible. Having decided, as we have, that Harris County, Texas may not operate a segregated cafeteria, Derrington v. Plummer, 5 Cir., 240 F.2d 922; that St. Petersburg, Florida may not operate a segregated swimming pool, City of St. Petersburg v. Alsup, 5 Cir., 238 F.2d 830; and the Supreme Court having decided that the City of Atlanta may not operate a segregated golf course, Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776, it is too plain for argument that Ouachita Parish, Louisiana may not, through its registrar of voters, operate a segregated registrar's office." Sharp v. Lucky, supra, 252 F.2d at p. 913.

The court of appeals for this circuit has also held that statutes and ordinances requiring segregation of the white and Negro races on the motor buses of a common carrier of passengers in the City of Montgomery, Alabama, violate the due process and equal protection of

the law clauses of the Fourteenth Amendment. Browder v. Gayle, 142 F.Supp. 707, 717 (M.D.Ala.1956), aff'd. 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114. See also Boman v. Birmingham Transit Company, 280 F.2d 531 (5th Cir.1960); Baldwin v. Morgan, 251 F.2d 780 (5th Cir.1958), and Baldwin v. Morgan, 287 F.2d 750 (5th Cir.1961). Reason dictates that if state authorities cannot maintain enforced racial segregation in recreational activities, Dawson v. Mayor and City Council of Baltimore City, 220 F.2d 386, 387 (4th Cir.1955), aff'd. 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774; Holmes et al. v. City of Atlanta et al., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776; City of St. Petersburg v. Alsup, 238 F.2d 830 (5th Cir.1956), or in cafeterias, Derrington v. Plummer, 240 F.2d 922 (5th Cir.1956), or in public transportation facilities, Browder v. Gayle, supra; Boman v. Birmingham Transit Company, supra; Baldwin v. Morgan, 251 F.2d 780; Baldwin v. Morgan, 287 F.2d 750,[3] such segregation is constitutionally impermissible in the matter of the exercise of the elective franchise, a function and prerogative of utmost importance in the process of government, and so intrinsically characteristic of the dignity of citizenship. Moreover, as this court sees it, the plain language of Section 1971(a) of Title 42 of the United States Code Annotated forbids any distinction in the voting process based upon race or color irrespective of whether such distinction involves an actual denial of the vote. United States v. Raines, 189 F.Supp. 121, 133 (M.D.Ga.1960), and see Lane v. Wilson, supra.

If, as defendants contend, the sole purpose of Section 1 of said Act was to guarantee to all persons regardless of their race the right to vote, the Congress, in enacting that statute, was legislating needlessly because in drafting the Fifteenth Amendment for proposal to the Legislatures of the several states it had already guaranteed that right. The Civil Rights Act went further and directed that all persons "shall be entitled and *allowed* to vote * * * without distinction of race, color, or previous condition of servitude." (Underscoring supplied). The Fifteenth Amendment, ratified March 30, 1870, preceded the Civil Rights Act of May 31, 1870 and was self-executing. United States v. Reese, 92 U.S. 214, 23 L.Ed. 563 (1876), 16 C.J.S. Constitutional Law § 50, p. 151. The above quoted language of Section 1 of the Act finds its parallel in Section 2 referred to and set forth in the dissenting opinion of Mr. Justice Hunt in the Reese case, and reads, in part, as follows:

> "It shall be the duty of every such person and officer to give to all citizens of the United States the same and equal opportunity to perform such prerequisite, and to become qualified to vote, without distinction of race, color or previous condition of servitude."

Reviewing the Fifteenth Amendment and these sections of the Civil Rights Act, the Supreme Court, in the Reese case, said on page 218:

> "It follows that the Amendment has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from *discrimination in the exercise* of the elective franchise on account of race, color or previous condition of servitude", (Italics supplied).

and on page 222:

> "[b]eyond doubt that section [Section 1] forbids all discrimination between white citizens and citizens of

---

**3.** "It is simply beyond the constitutional competence of the state to command that any facility either shall be labeled as or reserved for the exclusive or preferred use of one rather than the other of the races. * * * The factor of race is irrelevant from a constitutional viewpoint." Baldwin v. Morgan, 287 F.2d 750, 754.

color in respect to their right to vote;"

and on page 226:

"[c]onclusive support to that theory is also derived from the 2d section of the same Act, which was obviously passed to enforce obedience to the rule forbidding discrimination between colored male citizens and white male citizens in respect to their right to vote at such elections",

and on page 231:

"[e]very discrimination on that account [race, color or previous condition of servitude] is forbidden by the Fifteenth Amendment * * *."

■ No showing has been made or contention advanced that the separation or segregation here involved was a proper exercise of the police power of the State. Nor could such contention be successfully urged. The unauthorized deprivation of Constitutional rights could not be justified as being in the exercise of the police power of the State. Forty-four years ago the Supreme Court, in holding unconstitutional another facet of racial segregation, in a unanimous opinion said:

"It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149, 163 (1917).

And in one of the school cases, Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958), the Court said:

"The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. * * * Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights."

And in Orleans Parish School Board v. Bush, 242 F.2d 156, 166 (5th Cir.1957), the court of appeals for this circuit said:

"The vindication of rights guaranteed by the Constitution can not be conditioned upon the absence of practical difficulties."

See also Dawson v. Mayor and City Council of Baltimore City, 220 F.2d 386, 387 (4th Cir.1955), aff'd 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774. And the supreme court of Georgia has said:

"While the police power is very broad, its limits are within the Constitution." Carey v. City of Atlanta, 143 Ga. 192, 201, 84 S.E. 456, 459, L.R.A.1915D, 684 (1915).

■ The injunction sought to prevent a continuance of the practices complained of will be denied upon the ground that a necessity for such injunction has not been made to appear. The defendants are all honorable people and there is not the slightest suggestion that they will fail to comply with the law, once it is judicially determined. While the law makes it the duty of this court to grant the declaratory judgment as above indicated this court may and should exercise a sound discretion with respect to the prayers for injunction. The desirability of maintaining a healthy federalism dictates against the grant of injunctions in this area of conflict between federal law and state action, absent a clear showing of necessity therefor. Jurisdiction of the cause will be retained, however, so that should any additional relief become necessary this case can be reopened upon proper motion.

Counsel for plaintiffs may prepare a decree in accordance herewith, submitting same to counsel for defendants who shall have ten days for suggestions as to form.