**Willie BAILEY et al., Plaintiffs,**

v.

**Roy L. VINING, Jr., et al., Defendants.**

**Civ. A. No. 76–199–MAC.**

United States District Court,
M. D. Georgia,
Macon Division.

May 14, 1981.

Chris Coates, Atlanta, Ga., for plaintiffs.

Jesse Copelan, Jr., D. D. Veal, Eatonton, Ga., Wayne B. Bradley, Sanford Bldg., Milledgeville, Ga., for defendants.

OWENS, Chief Judge:

This action is brought by Willie Bailey and other black plaintiffs representing all black citizens of Putnam County, Georgia, and of Eatonton, Georgia, as a class, claiming that the at-large method of electing the city's mayor and commissioners, the county commissioners, and the county board of education members abridges the rights of the city and county blacks under the First, Thirteenth, Fourteenth, and Fifteenth Amendments of the Constitution of the United States. After repeatedly encouraging the parties at the numerous conferences and hearings to resolve this matter without the intervention of the court, and after their apparent failure to so do, this order reluctantly constitutes the court's findings of fact and conclusions of law concerning the voting dilution claims raised by plaintiffs.

The court finds that all prerequisites for the maintenance of a class action are here satisfied and therefore certifies the class of plaintiffs to be all black residents of Putnam County, Georgia. Federal Rules of Civil Procedure 23(b)(2).

## FINDINGS OF FACT

### A. A History of Racial Segregation in Putnam County

Putnam County, Georgia, with its 1970 population of 8,394, is located approximately forty-one miles to the northeast of Macon, Georgia, and approximately sixty miles to the southeast of Atlanta. According to the 1970 Federal Census 4,092 or 48.7% of the residents of Putnam County are black. The 1970 Census further indicates that 1,950 residents or 47.7% of the black population are "Under 18 Years" as compared to 1,359 white residents "Under 18 Years," or 31.66% of the white population. In 1976 the number of black registered voters was 1,311 (32%) in comparison with 2,847 (68%) white registered voters.

The City of Eatonton is Putnam County's only municipality. According to a 1978 special census conducted at defendants' request, 2,417 or 55.5% of the city's population totalling 4,353 are black and 1,931 or 44.5% of the city's population are white. Despite

such numbers blacks have not shared equally in the political process in Putnam County.[1]

The depressed socio-economic status of the black community is but one reason advanced for this lack of black participation in the political process. Eighty-one percent (81%) of those over the age of 25 in Putnam County who had completed four years or less of schooling are black. The median number of school years completed for a white female in Putnam County is 10.4 and for a white male is 9.3. The corresponding numbers for blacks is 7.5 for a black female and 6.0 for a black male. Whites generally earn $3,500 or 78% more per year than blacks. Consistent with these figures, 45% of all black residents exist below the poverty level, blacks represent the greater percentages of those who rent homes, and blacks suffer from poor public services more than the whites. Seventy-six percent (76%) of those dwellings in the county that lack some or all plumbing within, are occupied by black families. In the City of Eatonton, 90% of such units are occupied by black families. Almost one in two black households lack some or all plumbing. The policy defining which streets within the county and city are to be paved is now and has been applied in a discriminatory manner. While many streets serving black families remained unpaved, the official minutes of the Board of Commissioners reflect that the county agreed to pave the road to the all-white private school within a year after the institution was founded. Conversely it appears that only with commencement of federal revenue sharing funds has any paving been done in the black areas.

Other examples of this official discriminatory treatment can be readily gleaned from past records of the county and city officials. Examples of this conduct include the operation of white-only swimming facilities prior to 1968. For three years a private corporation, the Service League, was organized to operate the pool based upon an annual fee. The only "service" this league provided was to whites since blacks were still denied the use of the pool. In 1970 the city alleviated its problem by building a

1.

### Putnam County
#### 1970 U. S. CENSUS

| | White Pop. | % | Black Pop. | % | Total Pop. |
|---|---|---|---|---|---|
| 1. All Ages | 4,293 | 51.3 | 4,092 | 48.7 | 8,394 |
| 2. 18 yrs. and up | 2,934 | 57.8 | 2,142 | 42.2 | 5,076 |
| 3. 1976 registered voters by race | 2,847 | 68.0 | 1,311 | 32.0 | 4,158 |
| 4. No. of residents who, according to 1970 census, would be 18 yrs. or older by 1980 | 797 | 41.5 | 1,122 | 58.5 | 1,919 |

### City of Eatonton
#### 1978 SPECIAL CENSUS

| | White Pop. | % | Black Pop. | % | Total Pop. |
|---|---|---|---|---|---|
| 1. All Ages | 1,931 | 44.5 | 2,417 | 55.5 | 4,353 |
| 2. 18 yrs. and up | 1,393 | 49.1 | 1,442 | 50.9 | 2,835 |
| 3. Under 18 yrs. | 538 | 35.6 | 975 | 64.4 | 1,513 |

pool in the "colored section of town." Putnam County schools were totally segregated on the basis of race until the 1965–66 school year. Housing projects maintained by the Eatonton Housing Authority continue to be segregated on the basis of race. While the above represent but a few of the past official actions taken by county and city board members, they serve to highlight the double-standard with regard to whites and blacks within Putnam County.

Typical of many counties throughout the South, the winners of Putnam County's democratic primary elections also win the subsequent general elections to state and local offices. Putnam County's blacks could not vote in the democratic primary of this state until *King v. Chapman*, 62 F.Supp. 639 (M.D.Ga.1945), *aff'd*, 154 F.2d 460 (5th Cir. 1946) was decided by this court. In an apparent attempt to counter the impact of the *King* decision, Eatonton's city charter was legislatively amended [2] in 1947 to abolish primary elections and literacy tests were introduced in 1946 as a prerequisite to voter registration throughout Putnam County. No blacks registered to vote in Putnam County prior to 1948. The literacy tests effectively disenfranchised a large percentage of blacks until use of those tests was prohibited by the Voting Rights Act of 1965. Despite this court's decision in *Anderson v. Courson*, 203 F.Supp. 806 (M.D.Ga. 1962), outlawing the use of segregated voting lists, such lists were maintained in Putnam County until after the filing of this lawsuit in 1976. The designation found at the top of the 1976 list accurately depicts past and present reality: the black list was titled "Black Voters" and the white list "Voters." Voter registration cards were filed separately by race until just before this lawsuit commenced.

As already noted, actions of the local Democratic Party control elections in Putnam County. Until 1972 no blacks ever served on the Executive Committee of the local Democratic Party. Two blacks were appointed to the committee in 1972, which at that time numbered 18 to 20 members. Blacks have never been appointed as election officials in the rural precincts of Putnam County. In Eatonton black participation as election officials has been disproportionately low. Although repeated requests were lodged in hopes of improving black voter registration, no black was appointed to the Board of Registrars and no black was appointed as a deputy registrar until *after* this suit began.

Despite their high percentages in the Putnam County and Eatonton population, blacks have lost every opposed at-large election in this century.

In any area the size of Putnam County and Eatonton local government employment has a large impact upon income and status. Blacks are grievously underrepresented among county employees. In 1976 only nine of the sixty-six non-elected employees of Putnam County were black. Of the nine, five were employed as laborers or janitors.

While blacks are employed by the city in appropriate percentages, they remain relegated to the lower income, labor oriented jobs.[3]

2. The amending act was introduced at the request of Eatonton's city officials by the state senator and representatives elected by the voters of Eatonton and Putnam County. As a matter of local courtesy it was then enacted into law.

3. A three year summary of the City of Eatonton's employment record is as follows:

|  | 1976 | | 1977 | | 1978 | |
|---|---|---|---|---|---|---|
|  | Black | White | Black | White | Black | White |
| Supervisors | 1 | 5 | 1 | 6 | 1 | 6 |
| City Attorney | 0 | 1 | 0 | 1 | 0 | 1 |
| Clerical | 0 | 4 | 0 | 4 | 0 | 4 |
| Police Officer | 2 | 6 | 2 | 6 | 1 | 6 |

Since desegregation of the school system the number of blacks employed as teachers, principals, and system-wide coordinators has dropped from 55% of the total educational employment pool in 1969–70 to 38% of such in 1977–78.

In addition to their underrepresentation in the local government employment pools, blacks are also underrepresented on boards and committees appointed by the Board of Commissioners and the Eatonton City Council. The evidence of records shows that the Board of Commissioners has failed to appoint a single black to the Putnam County Development Authority, the Putnam County Board of Tax Assessors, the Putnam County Forestry Board, or the Putnam County Airport Committee. In addition the Board of Commissioners has never appointed a black to serve as Civil Defense Director or as Putnam County Sanitarian. While blacks have been appointed to serve on some county committees, the reasons for their appointments stem not from the voluntary actions of county officials, but instead can be traced to other reasons. In 1973, when both the Board of Commissioners and City Council were informed that new regulations of the Oconee Area Planning Commission required the appointment of black persons to serve on the Oconee Area Planning and Development Commission, a black was appointed for the first time. Plaintiff Bailey is the first and only black member of the seven-member Putnam County Hospital Authority. His appointment seemingly results from an attempt on the part of the Board of Commissioners to appease the black community. The City of Eatonton has never appointed a black to serve as Building Inspector and has appointed only one black to serve as a member of the board of the Eatonton Housing Authority (EHA), a body whose primary function is to provide low income housing assistance, a service of substantial importance to the black community.

Perhaps it is the lack of membership by blacks on the Eatonton Housing Authority which has allowed that body to continue to operate on a racially segregated basis. A 1974 administrative investigation of the housing authority by the Department of Housing and Urban Development (HUD) found that the project was maintained on a racially segregated basis; that "race-mixing" was not a goal of the Authority; that the white executive director would not meet with blacks to discuss housing problems; and, that the segregated assignment policies of the Authority resulted in blacks having to wait longer than whites to obtain project housing. It was not until 1976 that the Authority entered into a compliance agreement with HUD which required that it pursue a course of desegregation.

Without reciting a detailed account of the adjustment problems faced by the Putnam County school system and the Board of Education, suffice it to say that Putnam County, like numerous other counties—

|  | 1976 | | 1977 | | 1978 | |
|---|---|---|---|---|---|---|
|  | Black | White | Black | White | Black | White |
| Radio Dispatcher | 0 | 3 | 1 | 2 | 1 | 2 |
| Refuse Collector | 8 | 0 | 8 | 0 | 6 | 0 |
| Refuse Collector Driver | 4 | 0 | 4 | 0 | 4 | 0 |
| Utility Service Worker | 2 | 1 | 3 | 0 | 3 | 0 |
| Equipment Operator | 2 | 1 | 1 | 1 | 1 | 1 |
| Utility Service Helper | 2 | 6 | 2 | 1 | 3 | 0 |
| Laborer | 2 | 1 | 0 | 0 | 3 | 0 |
| Trainee | 1 | 0 | 0 | 0 | 0 | 0 |
| Totals | 24 | 28 | 22 | 21 | 23 | 20 |

north, south, east, and west—has openly resisted change within the school system.

Finally, various isolated acts of the Board of Education and the Board of Commissioners are significant to this litigation. In 1974 the Board of Education denied a black group's request to use the gymnasium for a program to raise money for a class trip because it "would put the Board in the position of appearing to support segregated activities." Two years later the all-white Kiawanis Club was given permission by the Board of Education to use school property for a carnival.

In 1976 the Board of Education passed a resolution which provided job protection for teachers who teach in public schools but who have their children attend private schools. The only plausible aim for that resolution was to officially sanction white teachers sending their children to the all-white Gatewood Academy without having to risk losing their job with the Board of Education.

In late 1977 the white Chairman of the Board of Education recommended that the Board of Education terminate its sponsorship of the Headstart program, a program which greatly benefits black children and which was at the time headed by a black director. The recommendation was made even though the chairman was unaware of the services provided to the community.

In 1975 the Board of Commissioners denied a request by black citizens for a monetary contribution to a child care center [relying on the recommendation of the County Attorney that such a contribution would be illegal]. This action was taken even though the all-white private golf club was, and still is, located on land that belongs to the county. As late as March 1, 1973, the Board agreed to help the golf club "in any way" in keeping the golf course in condition.

Prior to the filing of this civil action black citizens wrote to the Board of Commissioners requesting that it take the necessary steps to see that legislation was introduced in the Georgia General Assembly to change the method of electing Commissioners from at-large to single member districts. The Board did not respond.

### B. *The Election Schemes at Issue*

The Putnam County Board of Commissioners is composed of three elected officials who run at-large for numbered posts, must be freeholders, and must receive a majority of the votes cast. Pursuant to Ga.Laws 1921, p. 555, the Putnam County Board of Commissioners was authorized. The original legislation provided for three members elected at-large by a plurality of votes. No residency requirement was provided for and members of the Board were required to be freeholders. Georgia Laws 1943, p. 1100, imposed a numbered post requirement for candidates seeking a post on the Board of Commissioners in primary elections. Georgia Code §§ 34–1015 and 34–1513, sections of Georgia's state election code, imposed majority vote and numbered post requirements for persons seeking a post on the Board of Commissioners in both primary and general elections.

The Putnam County Board of Education is elected at-large with numbered post and majority vote requirements in effect. No residency requirement is in effect. Ga. Laws 1962, p. 776. Prior to 1962 members of the Board of Education were selected by the grand jury under Georgia's general constitutional scheme of election of members of boards of education.

Pursuant to Ga.Laws 1908, p. 620, the City Council of Eatonton was composed of a mayor and six aldermen. Subsequent to the filing of this action Ga.Laws 1977, p. 3236, was enacted[4] by the Georgia General Assembly. It provides for the election of four aldermen from single member districts and for the election at-large of the three remaining aldermen and the mayor. Defendants have conceded that the four wards created by Ga.Laws 1977, p. 3236, are unconstitutionally malapportioned on the basis

---

4. The defendants submitted this act under the Voting Rights Act for approval by the Attorney General, and it was approved.

of population. A majority vote requirement is in effect in Eatonton elections pursuant to Ga.Code § 34–1407 and a numbered post requirement is utilized for the election of the at-large aldermen as well as the aldermen elected from single member districts. No residency requirement is in effect for the at-large seats. In reviewing the events leading up to the proposed election change the court finds that the council members, because of a similar suit then proceeding against a neighboring county, were concerned about the possibility of a dilution suit in Eatonton. At trial defendant Vining stated that the council approved the legislation with the hope that it would stem the problem of a dilution suit. Council members were aware that all at-large seats would be controlled by white votes and of the likely outcome of voting in the proposed single member districts. For the 1977 elections registered white voters outnumbered black votes in all but one of the legislatively created wards. The inference to be drawn is that the present council members knew that the proposed election scheme would result in, at most, one or two black victories out of eight election contests. This is further evidenced by the remarks of State Senator Culver Kidd, legislative sponsor of the law, to plaintiff Bailey wherein Senator Kidd stated that blacks should be satisfied with the law in its final draft form or chance getting nothing. At that time and now, Eatonton's blacks outnumbered Eatonton's whites by at least 11%.

## C. *State Policy*

Defendants have presented no proof of, nor is this court independently aware of, any State of Georgia policy favoring at-large elections.

## CONCLUSIONS OF LAW

The Fourteenth Amendment to the United States Constitution provides in pertinent part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

The Fifteenth Amendment to the United States Constitution provides in pertinent part: "The rights of citizens of the United States or by any State on account of race, color, or previous condition of servitude."

The question presented in this litigation is whether the facially neutral at-large electoral systems under attack were created or maintained for the purpose of limiting minority groups from effectively participating in the electoral process. If they were so created or maintained, then the plaintiffs' right to vote was unconstitutionally diluted and remedial action is required.

### A. *Proof of Intent*

Inherent in every voting dilution case is the question of what evidence will suffice to establish a discriminatory purpose or intent. Seldom, if ever, will a plaintiff possess direct evidence of an election scheme created or maintained for the purpose of discrimination.[5] The plaintiffs must therefore rely on circumstantial evidence to establish a *prima facie* case. Undoubtedly a plaintiff will proffer to the court a plethora of social, demographic, and economic facts, all of which are designed to raise an infer-

---

**5.** Various attempts have been made by the courts to explain proof of invidious discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Such a discriminatory purpose may be gleaned from "a blend of history and an intensely local appraisal of the design and impact of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. 755, 93

S.Ct. 2332, 37 L.Ed.2d 314 (1972). In fact, to determine intent this court has relied in other cases upon the burden of proof necessary to sustain a criminal indictment, that is, "[i]ntent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendants' intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind." *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977).

ence of constitutional impropriety in the maintenance of an election plan. Historically, a party challenging an election scheme will also draw upon *de jure* acts of segregation, the majority of which pre-date the mid-1960's, and which are not only without defense on the part of election officials but are readily admitted as the general custom and practice of that day. The past official vestiges of discrimination, when combined with the present day reality of socio-economic conditions within the discriminated class provide, according to plaintiffs, sufficient proof of an intent to create or maintain a system which promotes invidious discrimination. Until the United States Supreme Court decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), such a standard has been authorized by the United States Court of Appeals for the Fifth Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). The test provided for the establishment of:

"... two categories of inquiry in cases alleging dilution of a group's voting power: one composed of 'primary' criteria and concerning the history and performance of the at-large plan, the other containing 'enhancing' factors and going to the existence of certain systemic devices that may enhance the underlying dilution. The primary factors include the group's access to the political processes, e. g., slating; the responsiveness of the governing body to the particularized needs of the group; the gravity of the state policy behind the at-large method of election; and the present effect of past discrimination upon the group's ability to participate in the electoral process. *Zimmer*, 485 F.2d at 1305. The enhancing criteria are the size of the at-large district; the portion of vote required for election, i. e.,

majority or plurality; the presence or lack of an anti-single shot rule; and whether candidates must reside in subdistricts." *Corder v. Kirksey*, 585 F.2d 708, 712 f.n.8 (5th Cir. 1978).[6]

The decision in *Bolden* called to question the validity of a litmus paper test such as that found in *Zimmer*. While the reporters and the appellate courts have not yet reached a consensus on the question of what impact *Bolden* has in the area of voting dilution cases, the recent decision of the Fifth Circuit Court of Appeals in *Lodge v. Buxton*, 639 F.2d 1358 (1981), involving a factual scenario similar to that presented in the instant litigation, furnishes a thorough analysis of *Bolden* and reconciles it with the prior case law.

The rule established in *Bolden*, as interpreted by *Lodge v. Buxton*, provides:

"A cause of action under the Fourteenth or Fifteenth Amendment asserting unconstitutional vote dilution through the maintenance of an at-large electoral system is legally cognizable only if the allegedly injured group establishes that such system was created or maintained for discriminatory purposes. A discriminatory purpose may be inferred from the totality of circumstantial evidence. An essential element of a prima facie case is proof of unresponsiveness by the public body in question to the group claiming injury. Proof of unresponsiveness, alone, does not establish a prima facie case sufficient to shift the burden of proof to the party defending the constitutionality of the system; responsiveness is a determinative factor only in its absence. The *Zimmer* criteria may be indicative but not dispositive on the question of intent. Those factors are relevant only to the extent that they allow the trial court to draw an inference of intent. The *Zimmer* criteria are not the exclusive indicia of discriminatory purpose and, to the extent they are not factually relevant in a

---

**6.** The *Zimmer* criteria do not provide an exhaustive list of factors which may raise an inference of discriminatory intent. The court may consider, in addition to *Zimmer* factors, "similar ones." *See Kirksey v. Board of Super-*

*visors of Hinds County*, 554 F.2d 139 (5th Cir. 1977) (en banc). One example of a "similar factor" considered in Kirksey is a depressed socio-economic status.

given case, they may be replaced or supplemented by more meaningful factors. Even if all of the Zimmer and other factors are established, an inference of discriminatory purpose is not necessarily to be drawn. The trial court must consider the totality of the circumstances and ultimately rule on the precise issue of discriminatory purpose. Finally, given the reality that each case represents an extremely unique factual context for decision, this Court will give great deference to the judgment of the trial court, which is in a far better position to evaluate the local political, social, and economic realities than is this Court."

Applying the test laid down in *Lodge*, the court makes the following conclusions.

### 1. Lack of Responsiveness

To establish a *prima facie* case the plaintiff must provide sufficient evidence to demonstrate that the officials elected through the alleged unconstitutional schemes were unresponsive to the needs of the black community. The evidence presented in the instant case shows that the elected officials who serve on the Putnam County Board of Commissioners, the Putnam County Board of Education, and the Eatonton City Council have been and are presently unresponsive to their black constituency which now comprise over fifty percent (50%) of the population in both the city and the county. The employment figures for the county and city governments establish that blacks are severely underrepresented in the overall employment picture. The figures for county employees at the time this lawsuit was filed show that blacks occupied only 13.6% of all county jobs, even though the 1970 Census county population is 48.7% black. Of the nine employees employed by the county, five are concentrated in the lowest level job categories. The same is true of the City of Eatonton, where the percentage of city employees is more representative of the city's population only because the city needs more labor-oriented jobs which are traditionally filled by blacks. A review of the county school system's employment picture shows that blacks are pre-cluded from equally participating in local government employment. Not only has the percentage of black teachers dropped 25% in the course of nine years, but it is further apparent from the record that blacks face greater obstacles in reaching the upper echelon administrative posts within the system. This underemployment is especially significant in light of the number of black students within the system. Without reducing the 1970 Census figures to reflect white children who attend the county's all-white private academy, it appears that black students who were between the ages of six and seventeen when the census was taken represent 60% of all children included in that group.

The court therefore concludes that the failure of the white officials to hire more than a token number of blacks for city, county, and school system jobs demonstrates an unresponsiveness to the particularized needs of the black community.

The unresponsiveness of county and city officials can further be seen by the appointment of a relatively small number of blacks to the boards and committees of the city and county government. This unresponsiveness is particularly true with respect to the Putnam County Board of Registrars and the Eatonton Housing Authority. The Board of Registrars appointed its first black after this suit was filed even though at the time a majority of the county's residents were black and even though blacks registered to vote in smaller percentages than whites. The Eatonton Housing Authority which is charged with the responsibility of providing housing for the city's low-income residents, of which 81% are black, had no black member until 1974. Since that time the city has appointed one black to serve thereon.

The road paving decisions at both the city and county level provide evidence of a lack of responsiveness to the needs of the black community. Shortly after the opening of all-white Gatewood Academy public funds were used to pave the road leading to that school. At the same time black streets in many neighborhoods remained unpaved.

That many streets in black neighborhoods have recently received paving and attention seems due primarily to the pendency of this lawsuit and the availability of federal money.

Likewise a number of programs presently sponsored by the Board of Education for the benefit of blacks are not persuasive indications of that Board's present responsiveness because those programs are also heavily funded with federal money.

Forcing black citizens to take legal action to protect their rights to integrated schools and grand juries, and to register and vote without interference is another example of unresponsiveness to the black community. Blacks in Putnam County have been forced to litigate segregation in the school system, *United States v. Georgia*, Civ. No. 12972 (N.D.Ga. December 17, 1969); the unconstitutionality of a city curfew, *Ruff v. Marshall*, Civ. No. 77–61 (M.D.Ga. October 5, 1977); and in this case have raised meritorious constitutional questions as to the validity of the jury selection plan. Even after the court admonished the county officials that blacks should be employed by the county in positions which have either a direct or indirect effect on the jury selection plan it was not until two years later and the threat of putting the county into receivership that the county and city officials took action.

Other factors which indicate unresponsiveness on the part of local officials include the operation of a segregated golf club on land owned by the county; the failure of the county and city officials to secure black deputy registrars until after this suit was filed; and the operation of a white-only swimming pool up through 1968. In addition, black requests that the city switch to single member districts met with what the court has found to be a clear attempt to keep the black vote diluted. A similar request directed to the county commissioners did not even elicit a response.

Finally, a number of white elected officials now in office testified that they were unaware of any past or present discrimination against blacks in Putnam County. The court cannot conscientiously find these officials to be responsive to black needs when they refuse to acknowledge awareness of even past discrimination against blacks. The court finds the factor of responsiveness *to weigh heavily in favor of plaintiffs*, particularly with respect to the Board of Commissioners and Eatonton officials.

### 2. *Present Effect of Past Discrimination*

A lengthy history of *de jure* and *de facto* discrimination has left Putnam County a racially polarized community. Because of the nature of politics in small communities, the past pattern of segregation operates to racially polarize voting in Putnam County. Local citizens usually vote for candidates with whom they are familiar. Because of a tradition of solely white leadership and business control, Putnam County's blacks are more familiar with white leaders and more prepared to vote for whites. Historically, they have had no other significant choice. Racially polarized white voting is in part demonstrated by the dramatic lack of success of black candidates in Putnam County elections.

Putnam County's blacks are far less affluent and educated than whites. Black candidates are less likely to match a white candidate's campaign support. Blacks hesitate to campaign in white neighborhoods, and some older blacks are still afraid to vote [as is demonstrated by their low voter registration]. Many blacks are convinced that voting can make no difference.

The court concludes from all of this that past *de jure* and *de facto* segregation has a present adverse affect upon black access to the political process in Putnam County. This factor also weighs in favor of plaintiffs.

### 3. *State Policy*

As previously stated, defendants have presented no proof, nor is the court independently aware of, any State of Georgia policy favoring at large elections. This factor also weighs in favor of plaintiffs. The court notes that the conclusion to be drawn from state policy is essentially the same as

that found by the district court and affirmed by the appellate court in *Lodge v. Buxton, supra,* at 5016, that is:

"... while [the policy is] neutral in origin, it has been subverted to invidious purposes. (emphasis added). Since it is a statute of local application, its enactment, maintenance or alteration is determined by the desire of representatives in the state legislature of the county affected. Burke's representatives have always been Whites. Accordingly, they have retained a system which has minimized the ability of Burke County Blacks to participate in the political system."

### 4. *Lack of Access to the Political Process*

Despite their large population percentage, blacks have not shared equally in the political process. Each factor considered persuasive by the court in *Lodge* is found in this case. Blacks have been unable to participate in the operation of the local Democratic party; blacks have been precluded from serving on local government committees in meaningful numbers. All of the above combined with the virtual nonexistence of black election officials in both the city and rural county precincts and with the absence of a registrar or deputy registrar until after this suit was filed explains to a great extent why no black has ever won an opposed at-large election in Putnam County in this century.

All of the foregoing persuades this court that blacks [under all three election schemes here challenged] have not had equal access to the political processes in Putnam County.

### 5. *Enhancing Factors*

Even though Putnam County is not large, a majority vote is required and candidates must run for numbered posts. These two factors impair the access of Putnam county blacks to the political process. On balance the court finds the enhancing factors to weigh slightly in favor of plaintiff.

### B. *Summation*

Having concluded that all the relevant primary and enhancing factors are established in plaintiffs' favor, the only question which remains is whether the totality of the circumstances warrants the conclusion that the electoral schemes in Putnam County are maintained for the purpose of restricting the access of the county's black residents to that system. Without question, this is a classic example of the heretofore valid *Zimmer* test for establishing a conscious invidious discrimination on the part of the controlling political powers. Mindful of the caveat in *Lodge,* that a court must not measure the validity of an election scheme by which party proved the presence or absence of the greatest number of factors, the court must ultimately ask itself whether under the totality of the circumstances those in control of the political process possess the means sufficient to effectively deny blacks access to the ballot box. If they do, the court must be persuaded that blacks are rendered helpless to vote into office members of their own race. In the absence of such control, the court would be bound not to intervene into the local affairs of Putnam County.

In the instant case black citizens now comprise a majority of the population within the county and the city. Demographic data forecasts that the black majority will continue to increase within the foreseeable future. Nevertheless blacks continue to lose every opposed at-large election; blacks continue to register to vote in smaller numbers than whites; and, blacks continue to vote in smaller numbers than whites. Several explanations may be offered to account for these trends. One answer is that blacks perceive their vote to be meaningless. A second is that they are unconcerned with the problems which confront them on a daily basis. Yet another is that blacks tend to vote for white candidates, and as a consequence slate fewer black candidates, because the white alternative is better qualified and more responsive to the black community's needs. Given the court's finding that white elected officials have been unresponsive to the black community, and given

the existence of qualified black candidates who have been unsuccessful in their bid for public office in Putnam County, the last explanation can be readily discounted. Likewise, the court's common sense tells it that no human being enjoys living below the poverty level, living in substandard housing or living as a second-class citizen on unpaved streets. If the city and county officials could point to but a single period in this century when blacks have been able to meaningfully participate in the electoral process, the court would be receptive to the proposition that blacks just aren't as interested in politics. The court suggests that a careful review of discrimination in Putnam County indicates the contrary. Having concluded that blacks are interested in their standard of living, and that the present elected officials ineffectively represent them, the court must examine whether their vote is perceived to be meaningless. The past history of official segregation within Putnam County combined with both their inability to elect members of their own race and with low voter registration and turnout compels but one conclusion— Putnam County blacks, through the actions of white elected officials past and present, have been denied equal access to the political process to such an extent that they will continue, in spite of their popular majority, to be defeated at the polls. There is no doubt that the at-large electoral systems in Putnam County were in the past, and are today, maintained for the specific purpose of limiting the county's and city's black residents' ability to meaningfully participate therein. In addition, Ga.Laws 1977, p. 3236, was enacted with discriminatory intent to dilute the black vote. Accordingly, all of the challenged election schemes must be set aside.[7]

7. In so ruling the court follows the holding in *Lodge*, wherein the court stated at footnote 11, slip op. pg. 4999:

"The rule we establish is for dilution claims brought under the Fourteenth and Fifteenth Amendments. We do not reach appellees First Amendment or statutory bases for affirming the District Court's judgment. With respect to the assertion that section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides a remedy for conduct not covered by the Fifteenth Amendment, we are bound by the

## REMEDY

Within ten (10) days the parties are directed to advise whether or not they wish a further evidentiary hearing. Each party, within an additional thirty (30) days, shall submit a proposed remedial order and within fifteen (15) further days may comment on or criticize a party opponent's suggestion. The court will then prepare a final remedial order.

SO ORDERED this 13th day of May, 1981.

expression of five Justices of the Supreme Court (see the opinions of Stuart, J. and Marshall, J., dissenting) that such is not the case. We do not express any opinions as to the application of the First Amendment or 42 U.S.C. § 1971 to this case. We believe such new courses should be charted by the Supreme Court which, as of yet, has not chosen to do so. We believe our restraint in this area is particularly appropriate given the fact that the District Court did not consider those grounds in its evaluation of the case."