[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 10, 2002
THOMAS K. KAHN
CLERK

No. 01-10859

_____

D. C. Docket No. 97-00622-CV-HL-5-2


MICHAEL CLARK, JOHN HARPER,
ALAN FOSTER, WILLIAM DARLEY,

Plaintiffs-Appellants,


versus


PUTNAM COUNTY, BILL MOORE, in his
official capacity as Chairman of the Putnam
County Board of Commissioners, SANDRA
ADAMS PREBOST, in her official capacity
as a member of the Putnam County Board of
Commissioners, JIMMY DAVIS, in his official
capacity as a member of the Putnam County Board
of Commissioners, ROBERT POOLE, in his
official capacity as a member of the Putnam
County Board of Commissioners, et al.,

Defendants-Appellees,

THE GEORGIA STATE CONFERENCE OF
NAACP BRANCHES,

Intervenor-Defendant-
Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____
**(June 10, 2002)**

Before EDMONDSON, Chief Judge, HILL and LAY*, Circuit Judges.

HILL, Circuit Judge:

This action challenges the constitutionality of two electoral districts in Putnam County, Georgia. Appellants claim that these two districts were racially gerrymandered in violation of the Equal Protection Clause of the United States Constitution. After a bench trial, the district court granted judgment to Putnam County. This appeal followed.

I.

In 1981, the United States District Court for the Middle District of Georgia invalidated at-large elections in Putnam County, Georgia (the "County"),

_____
*Honorable Donald P. Lay. U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

2

concluding that this electoral system had been created and maintained with the invidious discriminatory purpose of limiting black voters' meaningful participation in the electoral process in violation of their Fourteenth and Fifteenth Amendment rights under the United States Constitution. *Bailey v. Vining*, 514 F. Supp. 452, 463 (M.D. Ga. 1981). The court ordered the creation of four electoral districts,[1] with Districts 1 and 2 to be remedial majority-minority districts.[2] District 1 was constructed to have a black voting age population of 73.47%; District 2 to have 54.84% black voters.[3]

---

[1]There are two elective bodies in the County. The Board of Commissioners and the Board of Education each have one member from each of the four electoral districts. The chair of each board is elected at-large.

[2]In a majority-minority electoral district, a majority of the voting age population is from the minority population. Upon a showing of invidious discriminatory purpose in electoral districting, a court is entitled to remedy the constitutional violation by creating these majority-minority districts. *Mobile v. Bolden*, 446 U.S. 55 (1980).

[3]There is some minor disagreement in the record over these percentages. We have adopted the figures included in the County's submission to the Department of Justice in its Section 5 preclearance submission in 1982.

Over the next decade, however, the black population of Putnam County declined from over 40%, to just under 34%.[4]  This was attributable in large part to a substantial influx of white residents, largely into District 4.[5]  The 1990 census revealed that, as a result of these population shifts, the County's four electoral districts had become seriously malapportioned.  There was an overall deviation from equal district population of almost 75%.[6]  All concerned realized that the county's electoral districts would have to be reapportioned to satisfy the constitutional requirement of "one-person, one-vote."  *Reynolds v. Simms*, 377 U.S. 533 (1964); *Gray v. Sanders*, 372 U.S. 368, 381 (1963); *Hadley v. Junior College Dist.*, 397 U.S. 50, 56-57 (1970) (extending *Reynolds* to school board districts);

---

[4]The black voting age population declined farther still to 30.06% of the county's population.

[5]District 4 contains two lakes which have attracted many new residents.

[6]Ideal population size of a district is the quotient of the population of a county divided by the number of its electoral districts.  Overall deviation from this ideal size is the sum of the percentage one district is underpopulated and the percentage another district is overpopulated.  In 1990, Putnam County's District 3 had a population 41.6% higher (plus 41.6%) than the ideal, and District 1 had a population 33% lower (minus 33%).

4

*Avery v. Midland County*, 390 U.S. 474, 481-85 (1970) (county commissioner districts).[7]

The County hired Christopher Coates to assist it in the reapportionment process. He had represented the plaintiffs suing the County in *Bailey v. Vining*, which resulted in the court-ordered, remedial redistricting of 1981. Coates, along with the County, consulted with Linda Meggers of the Georgia Reapportionment Services Office in Atlanta, an office established by the legislature to provide technical assistance to local governments engaged in redistricting. It was Ms. Meggers who, at the direction of the County, actually produced the 1992 plan.

The plan was approved by a majority vote of the County's Board of Commissioners, and, pursuant to the Georgia Constitution, was presented to the legislature for its approval. Regrettably, the legislature followed a course not unfamiliar to those observing state action in matters of this sort. In short, the legislature walked away from the issue; defaulted its responsibility to deal with Georgia election matters; and failed to take any action on the 1992

---

[7]Reapportionment is required every ten years to ensure that electoral districts contain approximately equal populations, thus ensuring one-person, one-vote, as the Constitution requires. *See Reynolds*, 377 U.S. at 60.

reapportionment plan.[8]  The County, through Coates, took the plan to the district judge who, in *Bailey v. Vining,* had ordered the 1982 redistricting.  The County asked the court to amend its 1981 judgment by adopting the 1992 plan.[9]  Although the *Bailey* case had long been closed, the district court agreed and ordered the implementation of the new plan on an "interim" basis, until the Georgia legislature could adopt a constitutionally satisfactory reapportionment plan.  Once the plan was enacted, however, no further efforts for legislative approval were undertaken.[10]

The County did submit the plan to the Department of Justice (the "DOJ") for its approval.  Section 5 of the Voting Rights Act prohibits the County from instituting any changes in its electoral laws until they have been "precleared" with

---

[8]It may be said that in our nation of separation of powers, when the appropriate branch abdicates its responsibility, a vacuum in sovereignty results. Like nature, sovereignty abhors a vacuum, drawing an inappropriate branch, the federal court, into the abandoned arena.

[9]This was apparently accomplished informally since no Rule 60 motion to amend the judgment, nor any other pleading, was filed.

[10]We have been invited by appellants to hold that this highly unusual enactment procedure, in which Coates appears to have represented both sides of a case in which there was no real controversy, was *ultra vires*.  We decline to do so, however, since, absent statutory authorization, we are without jurisdiction to invalidate an order entered in another civil case.  Furthermore, appellants could have, but failed, to challenge that order on direct appeal.

the DOJ.[11]  42 U.S. C. § 1973c (1994).  To obtain preclearance, a covered

jurisdiction[12] must convince the DOJ that the electoral change was not adopted for

the purpose of discriminating against protected minorities, nor will have that effect.

The DOJ approved the plan, and the County implemented it.

---

[11] Under § 5, a covered jurisdiction must seek preclearance either by filing a declaratory judgment action in the United States District Court for the District of Columbia, or by submitting the election law change to the United State Attorney General for administrative preclearance.  The Voting Section of the Civil Rights Division of the DOJ is charged with administering preclearance on behalf of the Attorney General.

[12]Jurisdictions covered by § 5 include those which in 1965 had substantial histories of intentional disenfranchisement of black voters.  As the Supreme Court explained in *Beer*:

> Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been stuck down.  That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory. . . . Congress therefore decided, as the Supreme Court held it could, "to shift the advantage of time and inertia from the perpetrators of the evil to its victim," by "freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory."

425 U.S. at 140 (quoting H.R. Rep. No. 94-196, pp. 57-58 (1975)) (footnotes omitted).

After this court-ordered redistricting,[13] both of the County's majority-minority districts were maintained and each had approximately 60% black voting age population, despite the significant decline in the overall black population of the county.[14] Furthermore, over 90 % of the county's black population was assigned to these two districts. The County conducted its elections under this "interim" plan for ten years.[15]

_____

[13]There is substantial dispute as to whether the plan enacted by the district court in 1992 constituted "court-ordered" redistricting, or "legislatively-drawn" redistricting. While it is true that the county drew the plan which the district court ultimately ordered, it is also true that the Georgia legislature did not approve it, which left the plan null and void. Without court intervention, there would be no 1992 reapportionment plan to challenge. The fact is, there has been no legislatively-authorized redistricting plan in Putnam County for thirty years! We shall treat this plan as a court-ordered one, since it was.

[14]District 1 had 61.83 % black voters, and District 2 had 59.59 %.

[15]The constitutional status of this plan is not mooted by the 2000 census data, and any redistricting thereunder, since, absent invalidation, the majority-minority electoral districts established by the 1992 plan will serve as the benchmark for the 2000 redistricting. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 327-28 (2000). *See also Sanders v. Dooly County*, 245 F.3d 1289, 1291-92 (11th Cir. 2001) (effect of holding prior plan unconstitutional is to "prevent the Attorney General from using the [prior] plan as a base line for retrogression analysis in the post-2000 census round of preclearance proceedings under § 5 of the Voting Right Act") (citing Office of the Assistant Attorney General, Civil Rights Division, Guidance concerning Redistricting and Retrogression Under Section 5 of the voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5412, 5413 (January 18, 2001) ("Absent . . . a finding of unconstitutionality under *Shaw* by a federal court, the last legally enforceable plan will serve as benchmark for Section 5 review").

In 1997, plaintiff-voters filed this action challenging the 1992 plan. Plaintiffs allege that the County unconstitutionally racially gerrymandered its electoral districts in 1992, by purposefully maximizing the black voter population in Districts 1 and 2.

The district court rejected this claim, holding that race did not predominate over traditional districting concerns in the construction of the 1992 reapportionment plan. Furthermore, the court held that, even if race did predominate in the construction of the 1992 plan, the challenged districts were narrowly tailored to meet the compelling state interest of remedying black vote dilution created by racial bloc voting. The court entered a judgment for the County.

"[I]ntentional discrimination is a finding of fact." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). Accordingly, we review the district court's ultimate finding that race did not predominate in the reapportionment process for clear error. *Hunt v. Cromartie*, 532 U.S. 234 (2001). We must affirm the district court's finding unless we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573. We review *de novo* the district court's conclusion of law that the 1992 plan serves a compelling state interest. *NAACP v. Duval County Sch. Bd.*, 273 F.3d 960 (2001).

II.

The central mandate of the Equal Protection Clause of the United States Constitution is "racial neutrality in governmental decision making." *Miller v. Johnson*, 515 U.S. 900, 904 (1995). Racial classifications are antithetical to the Fourteenth Amendment, whose "central purpose" was "to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964).

The Equal Protection Clause also requires, however, that no race be denied the *effective* exercise of the right to vote. *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969) ("[t]he right to vote can be affected by a *dilution* of voting power as well as by an absolute prohibition on casting a ballot") (emphasis in original). Electoral schemes which cancel out or dilute the voting strength of racial groups are unconstitutional when they are adopted with a discriminatory purpose. *White v. Regester*, 412 U.S. 755 (1973 ). In order to state a racial vote dilution claim under the Constitution, intent to racially discriminate must be shown. *Mobile v. Bolden*, 446 U.S. 55, 62 (1980). In 1982, Congress amended the Voting Rights Act of 1965 to make unlawful any electoral practice which has even the *unintentional* effect of minority vote dilution. Amended § 2 provides:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by [minorities] in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973b (1994).

Race, therefore, may be taken into consideration in avoiding and remedying unlawful vote dilution by devising voting districts which ensure that all voters have an equally effective opportunity to participate in the electoral process. *Regester*, 412 U.S. at 769.

Race may not, however, be used as the primary tool in assigning voters to electoral districts. *Shaw v. Reno*, 509 U.S. 630, 642, 646 (1993). "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, . . . it may not separate its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 911(citations omitted). Traditional districting principles, such as protecting contiguity, compactness, incumbency and communities of interest may not be subordinated to race in the crafting of electoral districts. *Shaw*, 509 U.S. at 645. If race is shown to have predominated over these

11

traditional factors in the development of a redistricting plan, the Constitution requires that we strictly scrutinize that plan to determine whether it is narrowly tailored to serve some compelling state interest. *Id.*; *Bush v. Vera*, 517 U.S. 952, 959 (1996) (citing *Miller*, 515 U.S. at 916). If it is not, it is unconstitutional. *Miller*, 515 U.S. at 911.

III.

The County does not deny that it set out to maintain its two majority black voting districts, nor that it used race as a basis for assigning voters to those districts. This was not, however, the County's only motive. The County was also concerned with traditional districting criteria – especially incumbency – in reapportioning its electoral districts.[16] The issue, then, is whether race *predominated* over these traditional considerations in the 1992 redistricting. *Miller*, 515 U.S. at 916. "The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor

---

[16]The County states in its brief that "the 1982 Plan was in fact preserved as much as possible and that the only changes made were for the purposes of balancing the population in the districts, protecting incumbents, and preserving the districting principles that had been followed in the previous plan."

motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.*

1.      The Direct Evidence of Race-Based Apportionment

There is much in the record to indicate that racial considerations drove the 1992 redistricting. The Chairman of the County Commission at the time, Harold Dennis, testified that he told Coates that maintenance of the two majority black voting districts was his and other Commissioners' goal in the reapportionment process in order to ensure racial proportional representation on the County Commission and Board of Education. He testified that county officials instructed Ms. Meggers "that two of the voting districts [should] have black general populations and voter age populations as high as possible within the constraints of a range of % deviation no greater than, generally, plus or minus five %" and "to maximize the black voting strength in Districts One and Two."

Ms. Meggers testified that "her predominant consideration in crafting the plan was to maintain the core of the existing majority minority districts and strive toward a 60% black VAP [voting age population]." In order to achieve this benchmark, the County instructed her to include "every contiguous census block

available which would have the effect of increasing the black percentage in the two majority black voting districts."[17]

Coates testified that the City of Eatonton was divided so as to maximize the black population within Districts 1 and 2, while keeping as much of the white population as possible within District 3. Bill Moore, the current Chairman of the County Board of Commissioners, testified that the only reason behind District 4's boundary line placement was to include as many blacks within Districts 1 and 2 as possible and make each of these districts majority black. He testified that it was "common knowledge" that the "law" required this result.

These district lines enhanced the black voting strength in Districts 1 and 2, despite the fact that the County had lost almost 8% of its black population between the 1980 and the 1990 censuses. Coates testified that "we took the plan that existed, we changed it to the extent of attempting to preserve the two majority black districts. We were conscious about the race of the people in the districts in doing that, and we assigned them so as to achieve the majority black districts." He

---

[17]This representation was made to the DOJ in the County's § 5 preclearance submission.

testified that he believed that maintenance of the two districts was necessary in order to obtain approval of the plan by the DOJ.[18]

In fact, the County's § 5 submission to the DOJ describes the reapportionment of Districts 1 and 2 in exclusively racial terms:

> [We have] requested [of Ms. Meggers] that two of the four voting districts have black general population and voting age populations as high as possible within constraints of a range of % deviation no greater than generally plus or minus five %. Moreover, local officials requested that the available concentrations of black population be distributed substantially equally between two of the voting districts so that these districts would both be majority black.
>
> This approach to redistricting was specifically employed . . . because . . . of the fact that since 1982, two county commissions and school board districts have been represented by black representatives elected from majority black districts.
>
> Quite simply, the submitted plan . . . creates two voting districts in which black voting strength [in] Putnam County has been maximized. Such maximization is readily apparent when it is remembered that the submitted district voting plan provides for black populations in excess of 60% in two of four voting districts in a county which African-Americans constitute one-third of the population. (Emphasis in original)

---

[18]The view that the Voting Rights Act required as many minority controlled districts as physically possible was widely shared by state and county legislators at the time. Butler, 36 U. Rich. L. Rev. at 141-42. According to Butler, this view was justified because the Voting Section of the DOJ propagated a "maximization agenda," *see Miller*, 515 U.S. at 917, and enforced it through its Section 5 preclearance power. *Id.* In the early 1990's this led to the proliferation of electoral districts with "bizarre" shapes designed to aggregate minority populations. This continued until the Supreme Court in *Shaw* condemned this "racial assignment" of voters. 509 U.S. 630.

That race predominated in the 1992 redistricting is also evidenced by the letter the County directed its lawyer to send to the *Baily* district court in 1993 following the Supreme Court's rejection of race-based districting in *Shaw*. In that letter, the County's attorney sought the district court's advice about the continued constitutionality of the districts in Putnam County since they "were established along racial lines."

2.    Circumstantial Evidence

The 1992 plan assigns 90% of the black population to two districts, each of which contains approximately 60% black voters, in a county which contains only 34% black residents. These percentages were obtained by the deliberate manipulation of district lines to maximize the number of black voters in the two challenged districts.[19] Ms. Meggers testified that the decline in the black population in the county made the maintenance of racial hegemony in Districts 1 and 2 a "challenge;" she was ultimately able to do so only by utilizing the redistricting "tool" of keeping the majority black districts at a "negative population deviation," *i.e.,* an undercount. By deliberately choosing to underpopulate  the two

---

[19]Although neither District 1 nor District 2 have an excessively bizarre shape, *Miller* made clear that "parties alleging that a State has assigned voters on the basis of race are neither confined in their proof to evidence regarding the district's geometry and makeup nor required to made a threshold showing of bizarreness." 515 U.S. at 915. Shape must be considered in conjunction with racial and population densities. *Id.* at 917.

majority black districts, she was able to achieve the county's goal of at least 60 %

black voting age population within them.

Ms. Meggers testified that when she did have to add voters to Districts 1 or

2, she was careful to do so in a way that would avoid upsetting her 60% black voter

goal. For example, after some initial population shifting, District 2 was still

significantly underpopulated, resulting in too great an overall deviation from equal

district population. To reduce this deviation, she testified that she reached out into

the far north of District 2 to capture a group of voters because they were equally

divided racially. She chose this racially balanced group because shifting them

from District 3 to District 2 would help balance the districts' populations without

doing any "harm to my numbers." The parties refer to this area which protrudes

north into District 3 as the "feather." A by-product of the creation of the feather,

was the creation of a "land bridge" connecting the two parts of District 3 which

were virtually bisected by District 2's feather.

Similar byproducts of Ms. Meggers' redistricting were the "smokestack" and

the "pie slice." The smokestack, like the feather, was a protrusion into District 3 to

pick up voters who would help populate District 2 without upsetting the racial

goals. The pie slice is an area cut out of District 2, shaped like a piece of pie, to

exclude white voters from District 2. In each of these cases, Ms. Meggers testified

17

that these unnatural shapes were the result of a deliberate attempt to maintain and maximize the strength in the black voting districts.

IV.

We do not lightly reverse a district court's findings of fact. Nevertheless, in view of the record before us, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573. Contrary to everything said by the County during the plan's creation and implementation, and the uncontroverted, solemn representations made by it to the Department of Justice, upon which the plan received § 5 preclearance, the district court found that race did not predominate over traditional factors in the 1992 plan. This was clearly error.

In order to reach its conclusion, the district court had to do two things. First, it had to ignore the extensive testimony from all involved that race was the primary focus of the redistricting process. Second, it had to totally discount the County's own assertions, indeed admissions, in its § 5 submission to the DOJ that race was the paramount consideration in the redistricting process. Neither of these courses of action was justified.

1)   Race Predominated Over Traditional Districting Factors

18

The district court did not cite any of the extensive testimony from the county commissioners, Coates and Ms. Meggers that make it clear that, although malapportionment was the "*why*" of the redistricting plan, race was the "*how*." All of this testimony conceded that when decisions had to be made on how to shift population from one district to another, racial considerations dominated. The testimony was overwhelming that no shift was made that would have "done damage" to Ms. Meggers goal of 60% black voting age population in Districts 1 and 2. In view of this record, even the district court conceded that "it is virtually beyond dispute . . . that the County intended to maintain these districts as majority-minority districts in 1992."

Nevertheless, the court concluded that race did not *predominate* over traditional districting principles, because it found that the County's four electoral districts are relatively compact, adhere to natural boundaries, preserve communities of interest, and protect incumbents. We disagree.

The "mere recitation" that traditional factors were not subordinated to race is insufficient to insulate the County's decision to maximize the black populations of Districts 1 and 2. *Miller*, 515 U.S. at 919. The County's contention that traditional factors were not subordinated to race is not supported by the record. The evidence is overwhelming that the County decided at the outset to maintain its two black

19

voting districts and to assign as much of the black voting age population as possible to those districts. This agenda was never seriously questioned until after the Supreme Court's 1992 decision in *Shaw* which prompted the County to inquire of the district court concerning the constitutionality of its two race-based districts. *See Vera*, 517 U.S. at 961.

The fact that other considerations may have played a role in the County's redistricting does not mean that race did not predominate. Race may be shown to have predominated even if, as here:

> factors other than race are shown to have played a significant role in the precise location and shape of those districts. If the line-drawing process is shown to have been infected by such a deliberate racial purpose, strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than race, for the intentional classification of voters by race, though perhaps disguised, is still likely to reflect the "impermissible racial stereotypes," "illegitimate notions of racial inferiority" and "simple racial politics" that strict scrutiny is designed to "smoke out."

*Shaw v. Hunt*, 861 F. Supp. 408, 431 (E.D.N.C. 1994), *rev'd on other grounds*, 517 U.S. 899 (1996). We look now to the role played in the 1992 redistricting by each of the traditional factors.

1.    Shape

Putnam County's four electoral districts are relatively compact. The district court concluded that this fact militated against a finding that race predominated

20

over this traditional districting factor. The Supreme Court, however, has rejected this conclusion. *Miller* instructs that "bizarreness" of shape is not a threshold showing for racial gerrymandering.[20] 515 U.S. at 915. Shape must be considered in conjunction with racial and population densities, *id.* at 917, and in this case those factors militate against a finding that compactness trumped race when it came to reapportioning the districts.

Intentionally, over 90% of the county's black population was assigned to either District 1 or 2. The "feather," smokestack," and "pie slice" all indicate that when Ms. Meggers was looking for population to shift to bring her "deviation" into constitutional range, race determined who should be shifted. The fact that the resulting irregularities in natural boundaries are small does not undermine the inevitable conclusion that they are there at all precisely because their racial composition helped achieve the plan's racial goals. *See Miller*, 515 U.S. at 917 (such deliberate racial line-drawing supports a finding that race predominated in the redistricting process).

---

[20]"Shape is relevant not because it is an element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing the district lines." *Miller*, 515 U.S. at 913.

21

Race not only determined who *was* shifted in the 1992 redistricting process; even more importantly, it also determined who was *not*. Ms. Meggers could have reduced her almost 11% deviation from equal district population by shifting voters from the overpopulated "white" districts into the underpopulated contiguous "black" districts. She chose not to, however, because to do so would have done "harm" to her [racial] "numbers." As a result, the County, which undertook the 1992 redistricting to correct malapportionment, remains significantly malapportioned. The County's commitment to the constitutional mandate of one-person, one-vote was secondary to its primary racial agenda. This the Constitution does not permit. *Reynolds*, 377 U.S. at 568; *Shaw*, 509 U.S. at 642; *Miller*, 515 U.S. at 913.

2.    Communities of Interest

The district court also concluded that the plan elevated communities of interest over race in the redistricting process. It offered this explanation for District 3's "pie slice" which pulls population out of District 2 and places them into District 3. The district court approved the inclusion of the pie slice in District 3 because it is "characterized by fine, old houses and populated by a predominately affluent population, in contrast to the humbler conditions in the urban areas of District Two." The court concluded that, without the pie slice, there would have been an "unnatural division of this distinct community of interest." Even if

22

assignment of voters on the basis of socio-economic status is a legitimate, traditional districting principle, which appears unlikely, nothing in the record suggests that this was the reason for carving the pie slice out of District 2. On the other hand, the census tracts make clear that the population in the pie slice was largely white and would have done "damage" to Ms. Meggers' "numbers."

### 3. Incumbency

Finally, the district court accepted the County's and Ms. Meggers' contention that incumbency was, in fact, the primary consideration in the reapportionment process. While it is undoubtedly true that the County was interested in protecting incumbents, it is clear that "racially motivated gerrymandering had a qualitatively greater influence on the drawing of district lines than politically motivated gerrymandering, and that political gerrymandering was accomplished in large part by the use of race as a proxy." *Vera*, 517 U.S. at 969. The County sought to protect its two black incumbents by maximizing the black population in their districts.[21] Incumbency protection achieved by using race as a proxy is evidence of racial gerrymandering. *Id.* at 970. Furthermore, it is

---

[21]While the boundaries of Districts 1 and 2 follow many precinct lines, this is because Ms. Meggers designed these districts along racial lines, and race data was accessible to her at the precinct level. *See Miller*, 515 U.S. at 919 (striking down as racially gerrymandered Ms. Meggers' redistricting plan of the Georgia congressional districts).

23

indicative of the sort of racial stereotyping that the Supreme Court has condemned as resembling political apartheid:

> It reinforces the perception that members of the same racial group –
> regardless of their age, education, economic status, or the community
> in which they live – think alike, share the same political interests, and
> will prefer the same candidates at the polls.  We have rejected such
> perceptions elsewhere as impermissible racial stereotypes.
>
> * * *
>
> By perpetuating such notions, a racial gerrymander may exacerbate
> the very patterns of racial block voting that majority-minority
> districting is sometimes said to counteract.

*Shaw*, 509 U.S. at 647 (citing *Holland v. Illinois*, 493 U.S. 474, 484 n.2 (1990)).

Thus, we conclude that the district court's finding that traditional districting factors were not subordinated to racial considerations was clear error.

B.     The County's § 5 Preclearance Admissions

In order to uphold the plan, the district court also had to discount the County's own clear admissions in its § 5 preclearance application that race predominated in the 1992 redistricting.  The court did so by finding that these "representations" were made in an effort to persuade the DOJ that the plan was not retrogressive, and were, therefore, essentially "puffing."

The Supreme Court, itself, however, has consistently looked to statements in § 5 preclearance applications as evidentiary "admissions" sufficient to support a finding that race predominated over traditional districting principles.  In *Shaw*, the

24

Court observed that North Carolina's § 5 submission, which expressly acknowledged that the state's overriding purpose in redistricing was to create two congressional districts with effective black voting majorities, was "direct evidence of the legislature's objective." 517 U.S. at 906.

Similarly, in *Vera*, the Court affirmed the Texas district court's determination that several of Texas' congressional districts had been racially gerrymandered based upon the district court's "reliance on the State's own statements [in its § 5 submission] indicating the importance of race." 517 U.S. at 970. Thus, we do not believe that the district court's dismissal of the County's own clear admission that race predominated in this process was warranted.[22]

We conclude that the district court erred when it concluded that race was not the County's paramount concern in the 1992 redistricting. Accordingly, the plan must be strictly scrutinized to determine whether the County has demonstrated that these districts were narrowly tailored to satisfy some compelling state interest. *Shaw*, 509 U.S. at 645.

V.

---

[22]In fact, the doctrine of judicial estoppel would appear to affirmatively prohibit the County in this proceeding from contradicting its previous declarations made in its § 5 submission.

25

To withstand strict scrutiny, the County must demonstrate that its 1992 race-based redistricting plan serves some compelling interest. *Miller*, 515 U.S. at 920. Furthermore, the plan must have been narrowly tailored to achieve this interest. *Id.*

A.    The County's Compelling Interest

The district court held that, if the 1992 plan was race-based, it was justified by both the need to remedy past unlawful discrimination,[23] and to avoid retrogression in violation of § 5 of the Voting Rights Act.[24]  There are several reasons why we reject this conclusion.

II    No Evidentiary Basis for Remedial Districting

Although there is a "significant state interest in eradicating the effects of past racial discrimination," *Shaw*, 509 U.S. at 656, there is no evidence in this record of the need for remedial districting. There is none because the district court specifically excluded this evidence. Intervenors, the NAACP and several individual voters, urged the district court to hear evidence of racially polarized

---

[23]The district court concluded that "the 1992 plan withstands strict scrutiny in that it was reasonably drawn to further a compelling governmental interest in remedying the effects of past racial discrimination."

[24]The district court held that "[j]ust as the creation of the majority-black districts in Judge Owners' 1982 remedial order was narrowly tailored to remedy past discrimination, the maintenance of those districts in 1992 was narrowly tailored to continue that remedy and comply with the requirements of the Voting Rights Act."

26

voting in Putnam County. They argued that this evidence was necessary to meet the strict scrutiny test, *i.e.,* establish a compelling state interest.

The district court refused, noting that it was undisputed that the 1992 redistricting plan was developed as the result of *malapportionment*, the unequal distribution of *people* across district lines. Therefore, the 1992 redistricting plan was simply a *reapportionment* plan, and not a *remedial* plan developed as the result of a finding of § 2 liability.

Nor could it have been. The County already had two majority-minority districts, each consistently electing minority candidates, and there was no showing whatsoever that, in 1992, there was any need to remedy any minority vote dilution within these districts. In fact, the minority voters in these districts were already *over-represented* as the result of the underpopulation of these districts in relation to Districts 3 and 4. Thus, in this case, the district court correctly refused to hear evidence of that the 1992 plan was adopted to remedy minority vote dilution.

Nevertheless, the district court concluded that the 1992 plan is justifiable as a remedy for past unlawful discrimination. It based this conclusion on the demonstration of § 2 liability – vote dilution and racial bloc voting – which underlay the court-ordered 1982 plan.

This was error. The need for a race-based remedy in 1992 cannot be established by reliance on a 1982 wrong that has already been remedied. *Wygant*

27

*v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986) (plurality opinion) (under strict

scrutiny, State must have convincing evidence that remedial action is necessary

before implementing affirmative action). Nor can the court rely on some

"generalized assertion of past discrimination" to justify a race-based remedy.

*Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 909 (1996). In order to rise to the level of a

compelling interest, the alleged discrimination must be identified with "some

specificity" and there must be a "strong basis in evidence" before a court may

order a race-based remedy. *Id.* at 910 (quoting *Wygant*, 476 U.S. at 277). Since

there is no evidence in this record of an unremedied discriminatory purpose or

effect in the County's electoral districting, the district court erred when it held that

County had a compelling interest in remedying such discrimination.[25]

    2.    <u>Non-retrogression as a Compelling State Interest</u>

---

[25]The 1982 plan itself was "ameliorative." Court-ordered, in response to a finding of § 2 liability, the 1982 plan instituted the four electoral districts, two of which were majority-minority. As a matter of law, this plan was not a statutory violation. *Shaw II*, 517 U.S. at 912 (ameliorative plan cannot violate § 5 even if it fall short of what might be accomplished in terms of increasing minority representation unless it is constitutionally flawed) (citing *Miller*, 515 U.S. at 923-24 (Georgia's racially gerrymandered congressional district not required because there was no reasonable basis to believe that earlier enacted plan violated § 2)). As the 1982 plan was still effectively in place, there was no § 2 violation to remedy. "On its face, § 2 does not apply to a court-ordered remedial redistricting plan." *Abrams*, 521 U.S. at 90.

28

The Supreme Court has consistently held that the purpose of § 5's preclearance requirement is to avoid erosion in minorities' existing political opportunities. *Beer v. United States*, 425 U.S. 130 (1976). Under *Beer*, a plan is entitled to preclearance unless it "would lead to a *retrogression* in the position of racial minorities with respect to their effective exercise of the electoral franchise."[26] *Id.* at 141 (emphasis added).

In the early 1990's, the DOJ interpreted § 5's nonretrogression mandate to require both the maximization of the number of majority-minority districts, and the number of minority voters in those districts. *Miller*, 515 U.S. at 927 ("And the Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting brings the Act, once upheld as a proper exercise of Congress' authority under § 2 of the Fifteenth Amendment, into tension with the Fourteenth Amendment") (citations omitted); *Abrams*, 521 U.S. at 85-86 (Justice Department's "max-black" policy unconstitutionally "race-focused"). Section 5 preclearance depended upon compliance with this policy. *Id.*

---

[26]It has been suggested that "legislators can be justifiably anxious that they will be 'damned by the Constitution' if they consider race and 'damned by the Voting Rights Act' if they do not." Katharine Inglis Butler, *Redistricting in a Post-Shaw Era: A Small Treatise Accompanied by Districting Guidelines for Legislators, Litigants, and Courts*," 36 U. Rich. L. Rev. 137, 143 (2002).

As we have already seen, the County intended to comply fully with this policy. The Chairman of the County Commission at the time testified that he instructed Coates to develop a plan with two majority black voting districts and to maximize the black voting age population in those districts. It was his understanding that the "law" required this result. Coates testified that he, too, understood the law to require both the maintenance of the County's two majority-minority districts and the maximization of the black voting age population within them, and that he so instructed Ms. Meggers.

Ms. Meggers testified that she was instructed to maintain the two majority-minority districts in order to comply with the DOJ's nonretrogression guidelines. She constructed Districts 1 and 2 as supermajority black districts with approximately 60% black voters. She did so because she "thought that we needed to maintain 60% black VAP" in order to comply with the DOJ"s "65% rule," which conditioned preclearance upon a "minimum of 60% black VAP in a majority-minority district."

In the resulting plan, the City of Eatonton was divided along racial lines so as to accomplish this maximization of the black population in Districts 1 and 2. The County has explicitly conceded that it did so deliberately in an effort to create two districts in which black voters would constitute a super-majority because this was the "law."

30

In its § 5 submission to the DOJ, the County touted its successful maximization of the black vote in Districts 1 and 2:

> Quite simply, the submitted plan . . . creates two voting districts in which black voting strength in Putnam County has been maximized. Such maximization is readily apparent when its remembered that the submitted district voting plan provides for black populations in excess of 60% in two of four voting districts in a county in which African Americans constitute one-third of the population.  (Emphasis in original)

In view of this overwhelming evidence, the district court found that the County's 1992 plan was designed to comply with the DOJ's nonretrogression requirements by maintaining and maximizing its two majority-minority districts.[27] It also concluded, as a matter of law, that compliance with § 5 is a sufficiently compelling state interest to withstand strict scrutiny.  Accordingly, the district court held that, even if the County had racially gerrymandered Districts 1 and 2, maintenance of these two districts and maximization of the black vote within them complied with the DOJ's nonretrogression requirements and, therefore, satisfied the strict scrutiny test.

This is not the law.  Ironically, at the same time the County was boasting of its compliance with the DOJ's "black-maximization" policy, the Supreme Court

---

[27]"Had the County altered the general scheme of the 1982 districts to eliminate one of the majority-black districts created by Judge Owens, it would have caused a retrogression in the position of blacks in the electoral process."

was in the process of rejecting it. Less than a year after the DOJ precleared the 1992 plan, the Court held that race may not be used as the primary means of assigning voters to electoral districts.[28] *Shaw*, 509 U.S. at 642. Then, in *Miller*, the Court made clear that it does "not accept the contention that the State has a compelling interest in complying with whatever preclearance mandates the Justice Department issues." *Miller*, 515 U.S. at 922. The Court specifically held that the DOJ's "black-maximization" policy was an invalid interpretation of § 5's nonretrogression requirement. The Court said:

> In utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld. . . . [W]e recognized in *Beer* that "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." The Justice Department's maximization policy seems quite far removed from this purpose. . . . And the Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting brings the [Voting Rights] Act, once upheld as a proper exercise of Congress' authority under § 2 of the Fifteenth Amendment . . . into tension with the Fourteenth Amendment. . . . There is no indication Congress intended such a far-reaching application of § 5, so we reject the Justice Department's interpretation of the statute and avoid the constitutional problems that interpretation raises.

515 U.S. at 925-27 (citations omitted).

_____

[28]This decision prompted the Coates letter to the *Bailey* district court inquiring about the continued validity of the "race-based" 1992 redistricting.

The Court also said that "[w]hen a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination, we do not accept the government's mere assertion that the remedial action is required. Rather, we insist on a strong basis in evidence of the harm being remedied." *Id.* at 922. Thus, Section 5 does not confer "*carte blanche* on the DOJ to command racial gerrymandering in the name of nonretrogression." *Shaw*, 509 U.S. at 655. "[C]ompliance with federal anti-discrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." *Miller*, 515 U.S. at 921.

Accordingly, the district court erred when it held that, even under strict scrutiny, the 1992 plan survives because the County had a compelling interest in complying with the DOJ's nonretrogression policy. Race-based districting cannot survive strict scrutiny absent a compelling state interest, and the Court has made clear that that the DOJ's requirement of "black maximization" without any showing of a constitutional or statutory wrong, is not such an interest. *Miller*, 515 U.S. at 921; *Wygant*, 476 U.S. at 277.

Furthermore, even if "black maximization" were a compelling state interest, the 1992 plan would not survive strict scrutiny because it is not narrowly tailored to meet that interest.

2)      <u>1992 Plan Not Narrowly Tailored</u>

33

As a result of the 1992 redistricting, Districts 1 and 2 are underpopulated and Districts 3 and 4 are overpopulated. Ms. Meggers testified that she had to use the "tool" of under populating the two majority-minority districts in order to achieve the County's goal of a 60% black voting age population in those districts. This "challenge" was created by the sharp decline in the County's black population. There were simply not enough black voters to go around. Only by underpopulating the black districts, and overpopulating the white districts was Ms. Meggers able to create two black voting districts with supermajorities.

Of course, exact equality of population in electoral districting is not required. *Reynolds*, 377 U.S. at 577. Nor is there any bright-line numerical test to determine when a deviation from population equality is large enough to violate the constitutional requirement of one-person, one-vote.[29] *Chapman v. Meier*, 420 U.S. 1, 22 (1975). Nevertheless, the Supreme Court has instructed that court-ordered reapportionment plans "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Id.* at 27.

---

[29]The County suggests that the 16% deviation approved in *Mahan v. Howell*, 410 U.S. 315 (1973), constitutes some bright line upper limit. We reject this artificial line drawing as the Court has made clear that "a particular population deviation from the ideal may be permissible in some cases but not in others." *Swann v. Adams*, 385 U.S. 440, 445 (1967). *See also Chapman*, 420 U.S. at 22-23;

The County's 1992 plan produced an overall deviation of 10.64%. This is certainly more than the *de minimis* deviation required of court-ordered plans.[30] It even exceeds what the Supreme Court considers to be of "prima facie constitutional validity" for legislatively-drawn plans. *Connor v. Finch*, 431 U.S. 407, 418 (1977) (legislatively-produced deviations under 10% presumptively valid).

More importantly, however, the size of this deviation was not the unavoidable result of some traditional districting consideration, or even a remedial effort. On the contrary, it was race-driven. It was the inevitable product of the County's commitment to maintain and enhance the voting strength of its two black voting districts. This goal could only be achieved by the County's deliberate decision to compensate for its declining black population by under populating the two black voting districts and overpopulating the two white districts. Thus, in setting out to remedy malapportionment, the County designed a plan which deliberately malapportioned its districts.

The Voting Rights Act does not require this result. *City of Richmond v. United States*, 422 U.S. 358, 371 (1975). The Supreme Court long ago rejected the

---

[30]Although we have concluded that the 1992 plan is a "court-ordered" one, our analysis of why the deviation it produced is constitutionally infirm depends not on its size, but rather on the *reason* for that size – intentional racial gerrymandering.

contention that § 5 nonretrogression requires the permanent overrepresentation of minorities and underrepresentation of other elements of the community in order to avoid a diminution in the electoral power of a declining minority population. The Court held that neither of these alternatives was intended by Congress. *Id.* Rather, in such circumstances, § 5 requires no more than that the number of electoral districts "fairly reflect[] the strength of the [black] community."[31] *Id.*

Racial gerrymandering by malapportionment occurs when the deviation produced by underpopoulating a majority-minority district is too great to be justified. The Constitution does not permit the County to intentionally dilute the vote of any of its citizens. *Reynolds*, 377 U.S. at 577. The County's obligation is to make "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Id.*

Moreover, the County not only maintained its two minority districts, it actually succeeded in increasing the black voting age population in one of them, despite the decrease in the black population of the County. This was accomplished, according to County officials, in order to ensure that the voters in

---

[31]Even the DOJ has recognized in its newest guidelines that in some circumstances "retrogression" cannot be avoided. *Guidelines* 187, at 5413.

Districts 1 and 2 could elect their choice of candidates and the County government would continue to have proportional representation.[32]

In *Vera*, the Court rejected the maximization of the minority vote in a district in which their population had declined, warning that "[n]onretrogression is not a license for the State to do whatever it deems necessary to insure continued electoral *success*; it merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." 517 U.S. at 983 (emphasis in original).[33]

Nor does either the Constitution or the Voting Rights Act require racially proportional representation. *Bolden*, 446 U.S. at 75-76 ("The Equal Protection Clause of the Fourteenth amendment does not require proportional representation as an imperative of political organization"); 42 U.S.C. § 1973b ("[N]othing in this

---

[32]All testified that the continued representation of Districts 1 and 2 by "their" representatives was an important goal in the redistricting. Since 1982, the Board of Commissioners and the Board of Education had both had two black members (from Districts 1 and 2) and two white members (from Districts 3 and 4). The evidence was that the county commissioners believed that this equality of result was both required by the DOJ for preclearance and desirable from the point of view of maintaining racial harmony in the county.

[33]This language, coupled with the actual outcome in *Vera*, implies that when, as a result of demographic changes, a jurisdiction faces either creating fewer minority districts in its proposed plan than were in its existing plan or engaging in substantial racial gerrymandering to maintain the status quo, it must opt for the first alternative. Butler, 36 U. Rich. L. Rev. at 187.

Section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"). Awarding public office on the basis of racial quotas not only offends the equal protection clause, but would "balkanize" this country into competing racial factions. *Shaw,* 509 U.S. at 657. Under such a system, "elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." *Id.* at 648. As Justice Douglas explained almost forty years ago:

> Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on . . . .

*Id.* (quoting Douglas, J., dissenting in *Wright v. Rockefeller*, 376 U.S. 52, 66-67 (1964)).

The 1992 plan maintains the two 1982 majority-minority voting districts, and actually enhances the minority voting strength in one despite a declining minority population. In order to accomplish this goal, it chose to underpopulate its other two districts, thereby under representing those voters. Whether there was another way to accomplish the County's goals without diluting the votes in

38

Districts 3 and 4, we cannot say.[34]  We can say, however, that the 1992 plan, gerrymandered to guarantee race-based representation in Putnam County, was not narrowly tailored to serve a compelling state interest because it went well beyond what is necessary to avoid retrogression.  *Vera*, 517 U.S. at 983 (citing *Shaw*, 509 U.S. at 655).[35]

## VII.

In sum, we hold that Putnam County's 1992 redistricting plan is unconstitutional.  It assigns voters on the basis of race to electoral districts.  Since it does so, we have strictly scrutinized it to determine whether it is narrowly tailored to meet a compelling state interest.  We hold that it does not meet a compelling state interest because it was designed to satisfy the DOJ's 1992 nonretrogression requirements, which incorrectly interpreted § 5.  Furthermore, the plan is not narrowly tailored because it overpopulates the two majority districts, thereby unconstitutionally diluting the vote in those districts.  Additionally, it maximizes the concentration of minority voters in Districts 1 and 2, thereby seeking unconstitutionally to ensure their electoral success.

---

[34]Plaintiffs in this action apparently offered such a plan, but the County rejected it.

[35]One of the factors noted by the Court in *Vera* as indicative of an overly broad approach was the enhancement of minority voting strength in a declining minority population district.  517 U.S. at 983.

Accordingly, the plan is unconstitutional and the judgment of the district court is REVERSED.

EDMONDSON, Chief Judge, dissenting:

As I understand the record, the facts found by the district court are not clearly erroneous. Accepting the district court's facts, I consider no reversible error to be present. I would affirm the district court's judgment.